Roderick Webber

     v.                          Civil No. 18-cv-931-LM
                                       Opinion No. 2020 DNH 002
Edward Deck, et al.

# O R D E R

    Roderick Webber, proceeding pro se, brings eighteen claims against a large group of defendants arising out of alleged assaults on him that occurred during a "No Labels Problem Solvers" political event held at the Radisson Hotel in Manchester, New Hampshire, in October 2015. Specifically, Webber alleges that he was assaulted at the event by defendants Edward Deck (an employee or agent of Donald J. Trump for President, Inc.), Fred Doucette (a New Hampshire State Representative), and Manchester police officers.

    Several defendants move to dismiss the claims against them. Pending before the court are motions to dismiss by No Labels Problem Solvers ("No Labels") (doc. no. 100); XMark, LLC (North Carolina) and XMark LLC (Arizona)[1] (doc. no. 96); Trump Organization, LLC and The Trump Organization, Inc. ("Trump

---

[1] Webber names XMark, LLC (North Carolina) and XMark, LLC (Arizona) as separate entities. XMark has responded as a single entity and will be referred to as XMark in this order.

Organizations") (doc. no. 115); and President Donald J. Trump (doc. no. 98).

## STANDARD OF REVIEW

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts the well-pleaded factual allegations in the complaint as true and construes reasonable inferences in the plaintiff's favor. Breiding v. Eversource Energy, 939 F.3d 47, 49 (1st Cir. 2019). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## BACKGROUND

The following background information is summarized from Webber's second amended complaint, document number 75. The complaint is forty-five pages long, single-spaced, followed by thirty-two pages of additional material that Webber labels as appendices.[2]

---

[2] The appendices are comprised of information provided by Webber about some of the defendants and his communications with them. He includes links to various news media and "youtube" sites, and lists of things that Webber represents are videos, photos, financial records, and "Press." None of the actual

Webber describes himself as a "video and print journalist and a documentary filmmaker" and "a known internet and radio personality and peace activist." Doc. no. 75 at 1. He explains that during the 2016 presential campaign he became known as "Flower Man" because he would hand out flowers as symbols of peace to the major candidates. Webber attended a Trump Campaign event in September 2015, where his reading from the Bible, "First Timothy," caused him to be evicted from the event.[3] He also attempted to attend a Trump Campaign event on September 30 but was turned away "because he was wearing religious attire." Id. at 8.

Webber then planned to attend a "No Labels Problem Solvers" event on October 12, 2015, at the Radisson Hotel in Manchester, New Hampshire. He alleges that No Labels publicized the event as a public forum where citizens could challenge presidential candidates. He attempted to get press credentials for the event but was unsuccessful and, instead, attended as a member of the public.

---

evidence referred to in the appendices was filed as part of the record. For example, Webber did not provide copies of emails, videos, photos, articles, or documents. Therefore, the items referred to in the appendices do not provide evidence that can be considered by the court.

[3] Webber states that he was assaulted and threatened with violence and that he continued to receive threats after the event.

A No Labels spokesperson began the event by eliciting responses from the audience, encouraging the audience to shout and scream, and generally inciting a rowdy atmosphere. Jon Huntsman, Joe Lieberman, and Donald Trump spoke at the event. Webber did some filming and then sat with the press next to the stage.

The sound system was not working properly during the event, which caused difficulty for speakers. The microphone for audience members to use was not working during Candidate Trump's turn at the podium. Some audience members attempted to shout questions, which resulted in shouting from other audience members. Staff members brought out megaphones.

After Candidate Trump concluded his speech, Webber asked him if he was aware that Webber had been assaulted at a prior Trump Campaign event. Trump responded that Webber looked healthy. Edward Deck, who was inside the roped-off area for the stage, tapped Webber on the back and said that there was a microphone at the rear of the room and that questions were only being taken from the microphone.

Webber got up from his seat and went to the back of the room to use the microphone. He then realized that Deck had deceived him and that there was no microphone in the back. Deck, Trump campaign staff members, State Representative and Co-

Chair of New Hampshire Trump for President Fred Doucette, and others made a wall around Webber that blocked him from returning to his seat.

Doucette told Webber to keep moving and that he was not going to get to use the microphone. Webber told Deck, who was holding Webber, to get his hands off of him and asked him his name. Deck responded in a threatening manner.

Webber waved to Trump to signal for access to the microphone. James Pittman, an officer with the Manchester Police Department,[4] and Deck grabbed Webber's arms, moved him past the seating in the back of the room, and threw him into a table, which knocked the table over. No Labels employees who were aware of what was happening did not intervene.

Another Manchester police officer, Brian Cosio, joined Deck and Pittman. Their efforts to move Webber caused him to be thrown to the floor. No Labels employees continued to watch without intervening.

Officer Cosio and Officer Daniel Craig took Webber outside. When Webber asked, Cosio and Craig said that he was being detained. Captain Allen Aldenberg, who was a sergeant at the

---

[4] As discussed further _infra_, No Labels hired Pittman and three other off-duty Manchester police officers to act as security for the event. Each of the officers wore his uniform at the event.

time, arrived and told Webber that he was free to leave.  Craig agreed that Webber could leave.

Webber walked away from the hotel and stopped at a park bench with Aldenberg.  He asked Aldenberg to file a complaint against the people who Webber said had assaulted him.  Aldenberg took notes and then went back to the hotel to retrieve Webber's camera battery.  Webber saw that Aldenberg was talking with Pittman, Cosio, and Craig.  As Craig walked toward him, Webber shouted to Aldenberg to keep him away.  Aldenberg, Pittman, and Craig then arrested Webber.

Webber attempted unsuccessfully to file a complaint with the Manchester Police Department about his treatment at the event.  Several newspapers and other media published material about the event which Webber believes damaged his reputation. Webber contacted the Office of the New Hampshire Attorney General for assistance in pressing charges against those involved in removing him from the No Labels event and was told that the office would not open an investigation.  Despite the initial sympathy expressed by some staff at No Labels, the organization did not take responsibility for Webber's experience.

Webber then brought this action against President Donald J. Trump ("Trump"); Donald J. Trump for President, Inc. (the "Trump

Campaign"); the Trump Organizations; Edward Deck; XMark; No
Labels; the City of Manchester; James Pittman; Allen Aldenberg;
Brian Cosio; Daniel Craig; Fred Doucette; and JPA III Management
Company, Inc.[5]  He alleged eighteen claims against the various
defendants.

## DISCUSSION

As discussed <u>supra</u>, several defendants have filed motions
to dismiss.  The court addresses the various motions separately.

## I.   <u>No Labels' Motions to Dismiss</u>

Of the eighteen claims alleged in the second amended
complaint, Webber asserted twelve of them against No Labels.
They include several state law claims, such as: Assault (Count
I), Battery (Count II), Intentional Infliction of Emotional
Distress (Count III), Negligence (Count IV), Negligent Hiring
(Count V), Fraud (Count VI), and False Imprisonment (Count VII).
They also include five federal claims under 42 U.S.C. § 1983,
including Negligent Hiring and Retention (Count XII), Negligent

---

[5] The claims against JPA III Management Company, Inc. were
previously dismissed.

Supervision (Count XIII), False Imprisonment (Count XV), False Arrest (Count XVI), and Retaliation (Count XVII).[6]

No Labels moves to dismiss all claims against it on various grounds.  First, it moves to dismiss the state law claims for Assault (Count I), Battery (Count II), Intentional Infliction of Emotional Distress (Count III), Fraud (Count VI), and False Imprisonment (Count VII), arguing that all of those claims are based on a theory of vicarious liability for the defendant police officers' conduct.  No Labels argues that it is not liable for the actions of the other defendants and, therefore, those claims fail.

Second, No Labels moves to dismiss the federal law claims on the ground that it is not a state actor for purposes of § 1983.  Finally, it moves to dismiss the state law claims for Negligence (Count IV) and Negligent Hiring (Count V) on the ground that it did not breach any duty of care.

---

[6] It is unclear whether Webber intended to assert each of the five federal claims listed above against No Labels. Although he names No Labels as a defendant in certain of those claims, in others, he did not name No Labels as a defendant in the title but did include No Labels as a liable party in the supporting allegations.  Because No Labels' argument in favor of dismissal of the § 1983 claims does not address the specifics of any individual claim and instead rests on a broad legal principle, the court lists all of the § 1983 claims that allege liability of No Labels.

Webber objects, arguing that the defendant police officers were No Labels agents or employees, that No Labels conspired with the defendant police officers to violate his civil rights, and that he pleaded sufficient facts to state each of his claims against No Labels.

A.  Vicarious Liability

No Labels moves to dismiss Webber's state law claims of assault, battery, intentional infliction of emotional distress, fraud, and false imprisonment, which are based on the vicarious liability of No Labels for the defendant police officers' conduct.[7]  No Labels asserts that there is no basis for its vicarious liability for those torts.

In response, Webber contends that the defendant police officers who were involved in removing him from the No Labels event were No Labels employees.  In support, he points to his

---

[7] In support of his claim for battery in Count II, Webber also alleges that someone who worked for No Labels, wearing a checkered shirt, touched his shoulder.  Doc. no. 75 at ¶ 123. He provides no factual basis for the allegation that the individual was a No Labels employee, particularly in light of his allegations that other No Labels employees were wearing identifiable green shirts and yellow badges.  Nor does he allege that the contact was "harmful," an element of battery under New Hampshire law.  See Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 94 (D.N.H. 2011).  Thus, to the extent Webber intended to base his battery claim against No Labels on the allegation that an unidentified employee touched his shoulder, that claim fails.

allegation in the second amended complaint that No Labels paid to have the off-duty officers serve as security guards at the event.  No Labels responds that the police officers were independent contractors, which does not implicate vicarious liability except in rare circumstances that did not exist during the No Labels event.

Under New Hampshire law, an employer may be vicariously liable for the torts committed by an employee who was acting within the scope of his employment.  Tessier v. Rockefeller, 162 N.H. 324, 342 (2011).  Although Webber refers to the defendant police officers as No Labels' "employees or agents," the second amended complaint contains no allegations that the officers were No Labels employees.  At most, there is an allegation that No Labels paid the officers to act as security guards for the event.  Such an arrangement does not make the officers No Labels employees, but instead makes them independent contractors.  See Abbott v. Town of Salem, No. CIV 05-CV-127-SM, 2007 WL 764483, at *3 (D.N.H. Mar. 12, 2007).

"Respondeat superior, or vicarious liability, ordinarily does not extend to torts by independent contractors because the employer reserves no control or power of discretion over the

execution of the work."[8] Arthur v. Holy Rosary Credit Union, 139 N.H. 463, 465 (1995). Vicarious liability may extend to independent contractors, however, when a plaintiff can establish the following elements: "(1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions." Dent v. Exeter Hosp., Inc., 155 N.H. 787, 792 (2007). "Control by the principal does not mean actual or physical control at every moment; rather, it turns upon the principal manifesting some continuous prescription of what the agent shall or shall not do." Id. (internal quotation marks omitted).

Webber alleges that No Labels hired the defendant police officers as security guards for the event. In his objection, Webber states in conclusory fashion that he has alleged facts to show that No Labels had control over the officers. He cites no factual allegations, however, to show that No Labels provided a

_____

[8] An exception to the independent contractor rule exists when an injury occurred while the independent contractor was engaged in an inherently dangerous activity. Arthur, 139 N.H. at 465. That exception does not apply here, as work as a security guard is not an inherently dangerous activity. See Abbott, 2007 WL 764483, at *3-4.

"continuous prescription" of what the officers should or should not do while acting as security guards.[9]

Instead, Webber alleges that No Labels employees did not intervene in the officers' actions. Webber alleges that another defendant, Doucette, who was Co-chair of the New Hampshire Trump for President campaign and not a No Labels employee, suggested that he had the authority to remove Webber from the event and asked Webber if he had to get an officer to get Webber to leave. The officers and Deck then removed Webber from the room. Although Webber cites his allegation that "Defendants were often communicating through radios and headset apparatus," doc. no. 75 at ¶ 168, to show evidence that all defendants were working together against him, mere communications among unnamed defendants does not show that No Labels was providing "continuous prescription" to the officers of what they should or should not do. As such, Webber's allegations do not show that No Labels exercised control over the manner in which the

_____

[9] Webber appears to believe mistakenly that hiring the officers as security guards was by itself enough to show the level of control necessary to support the agency relationship. That is not the case. See, e.g., Harden v. Hillman, No. 3:15-CV-00594-JHM, 2018 WL 3559180, at *5 (W.D. Ky. July 24, 2018); Martinez v. Miami-Dad County, 32 F. Supp. 3d 1232, 1240 (S.D. Fl. 2014); Royas-Carreno v. Ariemma, 08-CV-2839-LTW, 2010 WL 11601219, at *7 (N.D. Ga. Mar. 31, 2010); Elrod v. Red Lobster Rest., CIV-06-147-T, 2007 WL 9711362, at *3 (W.D. Okla. Apr. 17, 2007).

12

officers conducted their security work that would support an
agency relationship for purposes of vicarious liability.

The claims against No Labels for assault, battery,
intentional infliction of emotional distress, fraud, and false
imprisonment in Counts I, II, III, VI, and VII are based on a
theory of vicarious liability.  Because Webber has not alleged
facts to show that No Labels is vicariously liable for those
torts allegedly committed by the defendant police officers,
these claims are dismissed against No Labels.


B.  State Actor – Claims under 42 U.S.C. § 1983

Webber brings claims against No Labels under § 1983 in
Counts VIII, X, XI, XII, XIII, XV, XVI, and XVII.  No Labels
moves to dismiss those claims on the ground that it is a private
entity, not a state actor, as is required for liability under
§ 1983.  Webber contends that No Labels can be deemed to be a
state actor because it conspired or participated in joint action
with the defendant police officers.

Section 1983 provides a remedy against persons who, while
acting under color of state law, deprive others of rights
secured by the federal constitution or federal law.  Klunder v.
Grown Univ., 778 F.3d 24, 30 (1st Cir. 2015).  Although a
private party does not ordinarily act under the color of state

law, a "plaintiff may demonstrate state action by showing that a private party has conspired with state actors to deprive him of a civil right." Arias v. City of Everett, CV 19-10537-JGD, 2019 WL 6528894, at *9 (D. Mass. Dec. 4, 2019) (internal quotation marks omitted). A private entity also may be deemed a state actor if the entity was "a willful participant in joint action with the State or its agents" and "jointly engaged with state officials in the challenged action." Dennis v. Sparks, 449 U.S. 24, 27-28 (1980).

A civil rights conspiracy requires an agreement between two or more persons to violate the plaintiff's federally protected rights. Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). To show joint action or a conspiracy between the state and a private entity, "'the relationship or nature of cooperation between the state and a private individual must be pled in some detail.'" McGillicuddy v. Clements, 746 F.2d 76, 77 (1st Cir. 1984) (quoting Glaros v. Perse, 628 F.2d 679, 685 (1st Cir. 1980) (emphasis in original)). Conclusory allegations and speculation about what might have happened are insufficient to show joint action or a conspiracy. McGillicuddy, 746 F.2d at 78; see also Lucero v. Koncilja, 781 F. App'x 786, 788-89 (10th Cir. 2019); Liberty Sackets Harbor LLC v. Village of Sackets

Harbor, 776 F. App'x 1, 3 (2d Cir. 2019); Little v. Hammond, 744 F. App'x 748, 751-52 (3d Cir. 2018).

Webber points to several allegations in his complaint which he claims support his theory that No Labels and the defendant police officers took joint action or acted in a conspiracy to violate his federal rights. For example, he cites his allegation that an unknown No Labels staff member "engage[d] in unwanted touching" with him. Doc. no. 75 at ¶ 45. He also cites his allegations that Officer Pittman grabbed him from behind without warning, that the officers conferred with each other about Webber's intent to file a complaint against them, that unnamed defendants often communicated "through radios and headset apparatus," and that the officers arrested him. In addition, Webber also cites his allegations that Doucette, Deck, Trump Campaign staff, and unidentified others made a "human wall" around him to block him from returning to his seat; that Deck and Pittman threw him into a table; that Deck, Pittman, and Cosio pushed him and threw him to the ground; that Aldenberg told him he was not detained; and that the officers arrested him.[10]

---

[10] Webber also cites videotape evidence and states that it clearly shows "Defendants jointly participating together to violate Plaintiff's civil rights." Doc. no. 126 at 10. Although Webber does not explain what is on the videotape,

Webber's cited allegations do not show that anyone from No Labels acted jointly or conspired with the defendant police officers to violate Webber's federal rights.  The only allegation that involves participation by anyone from No Labels is that, at some point, an unknown member of No Labels engaged in "unwanted touching" with Webber.  Webber fails to explain how that allegation is sufficient to show cooperation between No Labels and the defendant police officers so as to give rise to a § 1983 claim.

Although Webber alleges various actions by the defendant police officers, he does not point to any allegations that show an agreement to violate his rights or willful participation in the actions that he says violated his rights.  Webber has not provided any factual allegations, much less detailed allegations, about joint action or a conspiracy between No Labels and the defendant police officers.

Therefore, Counts VIII, X, XI, XII, XIII, XV, XVI, and XVII are dismissed as against No Labels.

---

regardless, the videotape evidence is not part of the record and cannot be considered.

C.  Counts IV and V

No Labels moves to dismiss Webber's remaining claims, for
negligence and negligent hiring, on the ground that it did not
owe a duty to Webber.  In support of both claims, Webber asserts
that No Labels owed him a duty to keep him safe from assault and
battery by the other defendants while he was attending the
event.  No Labels responds that it owed no such duty.

To state a claim for negligence, a plaintiff must allege
facts that show the defendant owed him a duty, breached that
duty, and that the breach caused the plaintiff harm.  Yager v.
Clauson, 169 N.H. 1, 5 (2016).  "Whether a duty exists in a
particular case is a question of law."  Riso v. Swyer, 168 N.H.
652, 654 (2016).  A plaintiff must allege facts that show a
reasonable probability that he would not have been injured but
for the defendant's negligence.  Beckles v. Madden, 160 N.H.
118, 124 (2010).

When a plaintiff contends that a defendant failed to
provide a safe environment, he must allege facts to show that
"it was reasonably foreseeable that an injury might occur
because of the defendant's actions or inactions."  Rallis v.
Demoulas Super Markets, Inc., 159 N.H. 95, 101 (2009).
An employer has a duty to use reasonable care in hiring,

training, and supervising its employees.[11]  Trahan-Laroche v.
Lockheed Sanders, Inc., 139 N.H. 483, 485-86 (1995); Cutter v.
Town of Farmington, 126 N.H. 836, 840-41 (1985).

To support his negligence claims, Webber alleges, based on
information and belief, that Trump was known for acts of
violence, that Deck had a history of assaults and batteries,
that Trump Campaign security also was prone to commit assaults
and batteries, and that Manchester police officers have a
history of misconduct and that No Labels "knew or should have
known . . . that Manchester Defendants would be likely to commit
intentional misconduct."  Doc. no. 126 at 17.  He alleges that
No Labels had a duty to protect him from Deck, Trump Campaign
security staff and supporters, and the defendant police
officers.

Despite Webber's personal impressions of those attending
the No Labels event, including the police officers who No Labels
hired as security, he provides no factual allegations to show
that No Labels knew he was in danger.  In other words, Webber
provides no allegations that show it was reasonably foreseeable

---

[11] The people that Webber alleges were involved in the
incident which he characterizes as assault and battery were not
employees of No Labels.  As discussed above, although Webber
alleges that No Labels hired the defendant police officers to
provide security, he has not alleged facts to show that the
officers were employees of No Labels.

to No Labels that he would be forcibly removed from the event by the defendant police officers and other security staff, and that he would be assaulted during that removal.  Further, Webber does not provide allegations to show that No Labels should have done something that would have prevented the interaction he had with security.  As a result, Webber's allegations do not show that No Labels owed him a duty to make the event safe for his particular activities or that No Labels owed him a duty to use reasonable care in hiring or supervising anyone at the event.

Therefore, Webber's negligence claims in Counts IV and V against No Labels are dismissed.

### D.  Summary

For the foregoing reasons, Webber cannot maintain any of his claims against No Labels.  Therefore, No Labels' motion to dismiss is granted.

## II.  XMark's Motion to Dismiss

Webber alleges that Deck owns XMark and that XMark has done work for and been paid by the Trump Campaign.  Of Webber's eighteen claims asserted in his second amended complaint, fifteen of them are brought against XMark.  They include several state law claims, such as: Assault (Count I), Battery (Count

II), Intentional Infliction of Emotional Distress (Count III),
Negligence (Count IV), Negligent Hiring (Count V), Fraud (Count
VI), and False Imprisonment (Count VII).  Webber also asserts
eight federal claims under 42 U.S.C. § 1983, including
Unreasonable Seizure (Count VIII), Excessive Force (Count IX),
two counts of Violation of the First Amendment (Counts X and
XI), Negligent Hiring and Retention (Count XII), Negligent
Supervision (Count XIII), False Imprisonment (Count XV), and
False Arrest (Count XVI).

XMark moves to dismiss all claims against it as barred by
the applicable statute of limitations.  In support, XMark points
out that a three-year limitation period applies to all of
Webber's claims against it, that those claims arose from events
that occurred in October 2015 at the No Labels event, and that
Webber did not bring claims against XMark until he filed his
first amended complaint in April 2019, more than three years
later.[12]

Webber concedes that each of his claims against XMark is
governed by a three-year statute of limitations and that he did
not bring claims against XMark until after the limitations
period passed.  He argues that his claims against XMark are not

_____

[12] Webber did not name XMark as a defendant in his original
complaint, which was brought within three years of the date of
the No Labels event.

time-barred, however, for three reasons: (1) his claims against
XMark relate back to his original complaint; (2) the discovery
rule applies to toll the limitations period; and (3) XMark
fraudulently concealed its relationship with Deck.

A.   Relation Back

Federal Rule of Civil Procedure 15(c)(1)(C) provides that
that an amendment to a complaint relates back to the original
complaint for purposes of changing or adding a party when the
claim would otherwise be time-barred if three conditions are
met.  Leonard v. Perry, 219 F.3d 25, 28 (1st Cir. 2000).  First,
the claim must arise out of the same "conduct, transaction, or
occurrence" as alleged in the original complaint.  Fed. R. Civ.
P. 15(c)(1)(B).  The second condition requires timely service.
Id. at (C).  The third condition requires that the new party
"knew or should have known that the action would have been
brought against it, but for a mistake concerning the proper
party's identity."  Id. at (C)(ii).  Webber contends that each
of these three conditions is met in this case.

XMark does not dispute that the first two conditions of
Rule 15(c) are satisfied.  The claims against XMark arise from
the No Labels event, which was also the basis for the claims in

the original complaint.  And there is also no dispute that XMark
received timely service.

XMark contends that the third condition, however, is not
met.  Specifically, it argues that the relation back rule does
not apply here because there was no "mistake concerning the
proper party's identity."  XMark contends that although Webber
may have been unaware of XMark's alleged role in the incident at
the No Labels event at the time he filed his original complaint,
Webber did not mistakenly name the wrong defendant.

Webber asserts, however, that he thought Deck was a Trump
Campaign employee and only learned that Deck had his own
security company, XMark, in February 2019 when he attempted to
serve Deck at an address that turned out to be the address of
XMark.  Under the circumstances in this case, Webber was
mistaken about the identity of Deck's employer, which is XMark
and not the Trump Campaign.  That is the only part of Rule
15(c)(1)(C) that XMark contests.  Therefore, the claims asserted
against XMark in the second amended complaint relate back to the
original complaint and are not time-barred.

### B.  Remaining Arguments

Because Webber's claims against XMark in the second amended
complaint relate back to the original complaint, the court need

not address Webber's remaining arguments as to why his claims
are not time-barred.  The court notes for the sake of clarity,
however, that even if the claims did not relate back, the
discovery rule would also apply to save the claims.

III. <u>Trump Organizations' Motion to Dismiss</u>

Of Webber's eighteen claims asserted in his second amended
complaint, sixteen of them are brought against the Trump
Organizations.  They include several state law claims, such as:
Assault (Count I), Battery (Count II), Intentional Infliction of
Emotional Distress (Count III), Negligence (Count IV), Negligent
Hiring (Count V), Fraud (Count VI), and False Imprisonment
(Count VII).  Webber also asserts nine federal claims under 42
U.S.C. § 1983, including Unreasonable Seizure (Count VIII),
Excessive Force (Count IX), two counts of Violation of the First
Amendment (Counts X and XI), Negligent Hiring and Retention
(Count XII), Negligent Supervision (Count XIII), False
Imprisonment (Count XV), False Arrest (Count XVI), and
Retaliation (Count XVII).

The Trump Organizations move to dismiss all the claims
asserted against them on the grounds that the court lacks
personal jurisdiction over them, the claims are time-barred, and
Webber fails to state actionable claims against them.  Webber

contends that the Trump Organizations have sufficient contacts with New Hampshire to support personal jurisdiction, that the relation back rule under Federal Rule of Civil Procedure 15(c) and equitable tolling doctrines make the claims timely, and that the claims are actionable because Deck was an employee and/or agent of the Trump Organizations.

### A.    Personal Jurisdiction

#### 1.    Personal Jurisdiction Standard

When personal jurisdiction is contested, the plaintiff bears the burden of establishing that the court has such jurisdiction.  See Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995).  Allegations of jurisdictional facts are construed in the plaintiff's favor, see Buckley v. Bourdon, 682 F. Supp. 95, 98 (D.N.H. 1988), and if, as here, the court proceeds based upon the written submissions of the parties without an evidentiary hearing, the plaintiff need only make a prima facie showing that jurisdiction exists, see Kowalski v. Doherty, Wallace, Pillsbury & Murphy, 787 F.2d 7, 8 (1st Cir. 1986); see also Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 674-75 (1st Cir. 1992).

"To make a prima facie showing of jurisdiction, a plaintiff may not rest on the pleadings.  Rather, he or she must 'adduce

evidence of specific facts' that support jurisdiction." Dagesse
v. Plant Hotel N.V., 113 F. Supp. 2d 211, 215 (D.N.H. 2000)
(quoting Forest-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d
138, 145 (1st Cir. 1995)); see also GE Mobile Water, Inc. v. Red
Desert Reclamation, LLC, No. 13-cv-357-PB, 2014 WL 900715, at *2
(D.N.H. Mar. 7, 2014).  The court is tasked with determining
"whether the facts duly proffered, [when] fully credited,
support the exercise of personal jurisdiction." Rodriguez v.
Fullerton Tires Corp., 115 F.3d 81, 84 (1st Cir. 1997) (citing
Boit, 967 F.2d at 675).  The court may also consider facts
offered by the defendants, but only to the extent they are
uncontradicted.  Mass. Sch. of Law at Andover, Inc. v. Am. Bar
Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).

Personal jurisdiction is determined based on the forum
state's long-arm statute and must also comply with the due
process requirements of the federal constitution. Harlow v.
Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005).  New
Hampshire's long-arm statute, RSA 510:4, permits courts to
exercise personal jurisdiction over non-resident defendants to
the extent allowed by due process. N. Laminate Sales, Inc. v.
Davis, 403 F.3d 14, 24 (1st Cir. 2005).  Thus, the court employs
a "constitutional analysis, which requires 'sufficient minimum
contacts with the state, such that maintenance of the suit does

not offend traditional notions of fair play and substantial justice.'" GE Mobile Water, 2014 WL 900715, at *2 (quoting Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir.2007)).

Within the confines of due process, personal jurisdiction may be general or specific. Harlow, 432 F.3d at 57. Webber asserts in his objection that both general and specific jurisdiction as to the Trump Organizations exist in this case.

"Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001) (internal quotation marks and citations omitted). To establish general jurisdiction, a plaintiff must meet a more stringent standard and show that the defendant's "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." Daimler AG v. Bauman, 571 U.S. 117, 139 (2014) (internal quotation marks omitted). Under both specific and general jurisdiction analyses, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum [s]tate." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

2.  <u>Analysis</u>

The Trump Organizations argue that Webber has not carried his burden to point to any facts that show it had sufficient contacts with New Hampshire to establish specific or general jurisdiction.  The court agrees.

In the second amended complaint, Webber identifies The Trump Organization, Inc. as a company with its principal place of business in New York City.  He alleges that defendant Donald Trump is the principal owner of the company and was the executive in charge at the time of the No Labels event.  Webber alleges that Trump Organization LLC is a "New York limited liability company, a multinational conglomerate engaged in inter alia, real estate development, management and brand licensing." Doc. no. 75 at ¶ 6.  Thus, Webber does not allege that the Trump Organizations themselves had any contact with New Hampshire.

In his objection, Webber points to his allegations that "based upon information and belief," one of the Trump Organizations had made payments to Deck or XMark prior to the No Labels event.  <u>Id.</u> at ¶ 5.  He also points to a statement Officer Pittman reportedly made that he was "approached by a Trump Security Officer," Deck, during the incident at issue in this case.  <u>Id.</u> at 77.  In addition, Webber argues that Trump's appearances in New Hampshire during his campaign provide a basis

for personal jurisdiction because he promoted the Trump Organizations and was the Chief Operating Officer of at least one company.

Webber has adduced no specific facts supporting the existence of personal jurisdiction with regard to the Trump Organizations.  Webber provides no substantiation for his allegation, based on information and belief, that the Trump Organizations made payments to Deck or XMark.  See, e.g., De Leon v. Ocean Motion Watersports, Ltd., No. 13-cv-218-SM, 2016 WL 3911880, at *2 (D.N.H. July 13, 2016) (holding that plaintiff failed to make out a prima facie case of personal jurisdiction because she "has done nothing to substantiate the minimal assertions that she makes 'upon information and belief' in her amended complaint").  Nor does Officer Pittman's purported statement describing Deck as a "Trump Security Officer" suggest that Deck worked for the Trump Organizations.  Webber alleges several times that Deck was a security officer for the Trump Campaign, noting that Federal Election Commission records show that Deck and XMark were hired and paid by Donald J. Trump for President, Inc.  See doc. no. 75 at ¶¶ 4, 7, 8, 9.  Finally, Webber points to no facts to show that Trump promoted the Trump Organizations while campaigning in New Hampshire, or that Trump's activities can be attributed to the Trump Organizations.

Because Webber lacks evidence to support his theories, he has not carried his burden to show that personal jurisdiction exists over the Trump Organizations in this case.[13]

### B.    Remaining Arguments

Because Webber has not shown that the court has personal jurisdiction over the Trump Organizations, the court need not address the Trump Organizations' remaining arguments. All claims against those entities are dismissed.

## IV.  Donald J. Trump's Motion to Dismiss

Webber alleges fifteen of his eighteen claims against Trump. The three not alleged against Trump are federal claims for negligent supervision (Count XIII), malicious abuse of process (Count XIV), and failure to intervene (Count XVIII).

Trump moves to dismiss all the claims against him, arguing that the court should decline to exercise jurisdiction over those claims and that Webber has not alleged facts to support his claims against him. In response, Webber asserts that claims

---

[13] Webber also references in his objection a case in New York state court, Galicia v. Trump, which he contends supports his allegations that this court can exercise personal jurisdiction over the Trump Organizations. For the reasons stated in the Trump Organizations' reply brief, Webber's reference to that case does not provide the needed evidence to support his allegations.

may be brought against a sitting president, that Trump is liable
as the alter ego of the Trump Campaign and The Trump
Organizations, that as the alter ego of those entities Trump is
vicariously liable for others' actions, and that Trump was a
state actor by acting jointly with the defendant police
officers.  Trump disputes Webber's theories of alter ego status,
vicarious liability, and joint action.

    A.  <u>Jurisdiction Over a Suit Against a Sitting President</u>

Relying on Nixon v. Fitzgerald, 457 U.S. 731 (1982), Trump
asks the court to decline to exercise jurisdiction over him.
"It is settled law that the separation-of-powers doctrine does
not bar every exercise of jurisdiction over the President of the
United States."  <u>Id.</u> at 753-54.  Nevertheless, "before
exercising jurisdiction, [the court] must balance the
constitutional weight of the interest to be served against the
dangers of intrusion on the authority and functions of the
Executive Branch.  <u>Id.</u> at 754.  With respect to private
litigation challenging unofficial conduct, the separation-of-
powers doctrine does not bar suit nor require a stay until the
president leaves office.  Clinton v. Jones, 520 U.S. 681, 705-06
(1997).  Instead, the court considers the potential burdens the
litigation will put on the president along with "the high

respect that is owed to the office of the Chief Executive" in determining whether and how the litigation should proceed.  Id. at 707.

In this case, Webber is not challenging Trump's official acts as president.  Instead, the suit brings claims based on the No Labels event that occurred before the presidential election.  For that reason, there is no danger in this case of intruding into the authority and functions of the president.  In considering the other pertinent factors, the court concludes that there is no need to decline to exercise jurisdiction or to stay the case.

B.  Alter Ego Theory

As alleged in the second amended complaint, the only interaction between Webber and Trump at the No Labels event occurred when Webber asked Trump if he was aware that Webber had been assaulted at a rally in Rochester, New Hampshire.  Trump answered that Webber looked healthy.  Therefore, Webber's claims against Trump do not arise from Trump's own actions, but rather from the actions of others that occurred after that exchange.

In his objection to Trump's motion to dismiss, Webber argues that Trump is liable because he is the alter ego of the Trump Campaign and the Trump Organizations.  Webber relies on

legal standards for alter ego status from other states and does not explain why those standards, instead of New Hampshire law, would apply here. After Trump pointed out Webber's mistake, Webber argued in his surreply that he alleged sufficient facts to show alter ego status under New Hampshire law.

As discussed supra, the court dismisses the claims asserted against the Trump Organizations. Therefore, the court analyzes the alter ego issue as to the Trump Campaign.

In New Hampshire, application of the alter ego doctrine, or piercing the corporate veil, allows the court to ignore the legal separation between owners and the corporation. Mbahaba v. Morgan, 163 N.H. 561, 568 (2012). When the doctrine applies, the corporate owner becomes individually liable for the corporation's debts. Id. The doctrine applies and individual liability is assessed "where the owners have used the corporate identity to promote an injustice or fraud on the plaintiffs." Norwood Grp., Inc. v. Phillips, 149 N.H. 722, 724 (2003).

Webber argues that Trump is the alter ego of the Trump Campaign because he controlled that entity. Although the second amended complaint includes allegations of the relationship between Trump and the Trump Campaign, it provides no grounds to support the application of the alter ego doctrine. Webber provides no allegations that Trump used the identity of the

Trump Campaign to promote a fraud on Webber in the context of his claims in this case.

### C.  Vicarious Liability

Webber also contends that Trump is vicariously liable for the actions of the Trump Campaign, Deck, and Doucette because they were his employees.  In support, Webber cites his allegations that Trump watched the behavior of the other defendants during the No Labels event.  He also states, based on information and belief, that "the Federal Election Commission (FEC) has documented sizable payments from the Trump Campaign to Defendants Trump, Deck, Doucette, XMark Companies and City of Manchester for services at or around the time of the events in this complaint."  Doc. no. 75 at ¶ 112.

Webber fails to explain how Trump's actions of watching the other defendants' behavior during the No Labels event could give rise to vicarious liability.  In addition, Webber's allegations concerning payment, if taken as true, establish only that the Trump Campaign paid Trump and others, not that Trump personally paid any defendant.  Webber does not allege any grounds to show that Trump personally employed the Trump Campaign, Deck, or Doucette or that Trump is vicariously liable for their actions

based on another relationship.  Therefore, vicarious liability is not a viable theory to show Trump's liability in this case.


D.    State Actor – Claims under 42 U.S.C. § 1983

Webber asserts several claims against Trump under § 1983. Trump moves to dismiss those claims on the ground that at the time of the events giving rise to Webber's claims, he was not a state actor, as is required for liability under § 1983.  Webber contends that Trump can be deemed to be a state actor because he conspired or participated in joint action with the defendant police officers.

As explained supra, a private person also may be deemed a state actor if the person conspired with state actors to deprive the plaintiff of a civil right or jointly engaged with state officials in the challenged action.  Webber states that he has alleged that Trump had an express or implied "meeting of the minds" with the defendant police officers to prevent Webber from asking a question and then to punish Webber for attempting to ask that question.  The court disagrees.  Viewing the allegations in the second amended complaint in the light most favorable to Webber, Webber fails to allege—much less in detailed fashion—that Trump acted jointly or conspired with the defendant police officers to violate Webber's federal rights.

34

E.  <u>Result</u>

Webber has not alleged facts to show that Trump's own actions gave rise to any of the claims asserted against him. Webber also has not provided facts to show a basis for applying the alter ego doctrine or to support vicarious liability. Therefore, he has not stated a claim against Trump.


**CONCLUSION**

For the foregoing reasons, No Labels' motion to dismiss (doc. no. 100), the Trump Organizations' motion to dismiss (doc. no. 115), and President Donald J. Trump's motion to dismiss (doc. no. 98) is granted.  All claims against these defendants are dismissed.  XMark's motion to dismiss (doc. no. 96) is denied.

SO ORDERED

_____
Landya B. McCafferty
United States District Judge

January 6, 2020
cc:  Peter S. Cowan, Esq.
     Samantha Dowd Elliott, Esq.
     Chloe F. Golden, Esq.
     Bryan K. Gould, Esq.
     Christian Hinrichsen, Esq.
     Matthew David Mortensen, Esq.
     Adam B. Pignatelli, Esq.

Jonathan S. Spaeth, Esq.
Roderick Webber, pro se